SALMON, Appellant *v.* STUYVESANT, respondent, 16 Wend. Rep. 321.

*Devise to Trustees to make Partition of Real Estate of Testator; Power to Tenants for Life to Lease for 63 Years and to appoint Estate among Children and Grand-Children; Will Void in Part, how far Void in Whole.*

APPEAL from Chancery. The respondent, Stuyvesant, filed a bill against Salmon, the appellant, before the Chancellor for the specific performance of a contract for the purchase of a certain house lot in the city of New York which had fallen to Stuyvesant upon a partition made of the real estate of which his father died seised, *according to the shares as directed by his will.* The bill stated that on the 3d of June, 1834, a contract was entered into between the plaintiff and Salmon, by which he agreed to convey the lot to Salmon, who agreed to pay him for it $800; and that subsequently Salmon had given him notice that he would not complete the purchase, as he had been advised that the respondent could not convey a good title to the lot in fee simple absolute. The bill stated that the plaintiff had been advised that by the Revised Statutes, the whole will was *void*, as it respects the real estate, and that it descends to the heir at law of the testator; or, if the will is to be deemed valid, that it is to be deemed a devise by the testator to his children in fee simple.

By his will made in 1828, the father of the respondent devised all his real estate to his executors, *in trust*, to make partition of the same into *nine shares;* viz: *six* shares consisting each of 5–42d *undivided parts;* the whole, into 42 equal parts to be divided, and *three* shares each to be 4–42d undivided parts: to convey to *each* of his six sons one of the 5–42d parts to his use, *for and during his natural life;* with *power to lease, devise, and appoint* as follows:

1. To make leases for a life or lives or terms of years, to take effect in possession and not to be for a longer period than a *life or lives* in being at the time of making thereof, or for a longer *term* than 63 years.

2. To devise and appoint by last will and testament, the land conveyed to him for life, to or in trust for, any one or

more of his children, grand-children, nephews and nieces, for such estates and subject to such powers as he should think fit; and for want of such appointment, to the children of such son, or to the children of any child of such son, who might have died before him and their heirs as tenants in common; and if no child or grand child surviving, then the share of such son to go to the right heirs of the testator.

In respect to the shares of the *daughters*, he directed the executors to convey one of them to such trustee as each daughter should name, in *trust*, to *allow* such daughter to receive the rents and profits thereof during her- life; with the same power of leasing, and of devise and appointment as to the sons.

In February, 1833, the testator made a *codicil* to his will, in which after adding three more executors, and directions as to payments made and responsibilities assumed for his sons in law, he *republished* his will made in Oct. 1828.

The cause was brought to a hearing before the Chancellor upon bill and answer, who decreed, that the *power* contained in the will, authorizing the sons and daughters to devise and appoint their shares to or in trust for their children, &c., for such estates, &c., as they should think fit, was illegal and void; that the limitation over of the *ultimate remainder* was also void; and that consequently the real estate of the testator upon his death descended to his heirs at law. The Chancellor, however, further held that the directions of the will were valid as to the *shares* to be distributed to each; that the partition should be deemed valid, and that the respondent could therefore convey an absolute fee simple in the lot in question; and he decreed that the defendant specifically perform the agreement. The defendant appealed. In the court of Errors, Cowen, J., delivered an opinion in favor of *reversal*:

He held:

I. That the *codicil* brought the will within the operation of the revised statutes, which transferred all the uses and trusts for the sons and daughters into possession. The executors took no legal estate. (1 Rev. Stat. 722, 2d Ed. § 47.)

II. 1. The power of appointment by devise, and of leasing for years, are the only other parts of the will affected by the revised statutes.

The power of appointment of estates for life, to persons not living at the testator's death, he holds to be void ; but not so as to those in *esse :* and it still may be effectual to pass a fee to either. § 17, and 129. Alienation is here suspended for one life only in being. It will be time enough to nullify the execution of this power, when we see the appointment of a life estate to a relative who was unborn when the testator died, or other estate created beyond the legal scope of the power. § 129 of Powers.* 1 R. S. 730, 2d Ed.

2. In respect to the power to lease for 63 years, he held that a lease though bad for 63 years, would be good for 21 years within the 87th section of the statute of powers, if expressly so limited ; but that § 92 had destroyed the power. The power to devise for the life of the devisee, he held, however, to be still inherent in his estate; and a remainder in fee is thus limited, in default of appointment to the lineal descendants of the tenants for life, and in default of such, then to the right heirs of the testator.

" According to this view, all those independent parts of the will which are allowed and declared available by the statute, are saved ; and those other independent parts which are void by statute, are avoided. (*Doe* ex dem. *Thompson* v. *Pitcher*, 6 Taunt. 369.) The courts have always saved such estates as are well limited. 3 Atk. 617. (p. 327.)

" In the present case, all the direct limitations are valid. One of the powers is valid. A mere collateral beneficial power, no part of the estate to make or lease for three lives, or 63 years. What have we left? In the first place a perfect devise for the life of the first takers. Yet the Chancellor's decree holds this void, and that the land descends in fee : though I admit it comes to the same thing, as if he had adopted the estate for life, as to the purposes of this cause.

Then as to the remainders over : It is true they are contingent, but they must vest in fee on the termination of two lives, and now, since the beneficial power to lease is gone, must at all events vest in possession on such determination.

---

* § 159. No estate or interest can be given or limited to any person by an instrument in execution of a power which such person would not have been capable of taking under the instrument by which the power is granted.

Can it be, that because a collateral power has failed, therefore the whole estates must go with it?

"On the whole, I can not consent to participate in the endorsement of this title. I can no more consent to the nullification of a legal operative will, on the ground that it brings the estate into a supposed unfavorable posture, than I can join in rectifying a bargain which turns out to be unfavorable to the party. In short, I will not go out of the will itself, and pry into the affairs of the estate, in order to fix a construction upon parts plainly legal and valid. Judging from what we have heard and felt, in the course of this term, I am sure if we impose an understanding of our statutes in this branch of the law, as a condition to the making of a will, very few will succeed; and if we undertake to make new wills for every partial failure, while we embark in an interminable labor, I still fear we shall not be better testators, than those who were more lawfully employed in disposing of their own estates." (p. 332.)

He says the case of Lorillard holds no such doctrine as that "a failure in part is fatal to the entire instrument. No will of any considerable estate, embracing various kinds of property, and seeking to provide for a numerous family, could ever stand the test of such principles."

"On the whole," he concludes, "if we agree with the Chancellor, that the will is to be retained, as to the trust power of partition, I am unable to see any reason for rejecting other provisions equally valid; and on the other hand, if, as the Chancellor holds, the land descends to the heirs at law, in either view, the respondent can not make such a title as he agreed to convey," and the decree must be reversed.

With the result of this opinion, Bronson, J., and Nelson, Ch. J., concurred; but declined, at that time, to pass upon the validity of the will, as both parties before the court agreed that the devise was invalid, and the only point in difference between them was, as to the proper rule of division between the sons and daughters; and which was the ground of appeal from this decree.

Bronson, J., said: "They can not take as heirs against the will, and in unequal portions under the will. We

66

need go no further; for whether the will is valid or not, the respondent is unable to make a good title. If the will stands, he has only a life estate; if it falls, he and the other sons must take in equal portions with the daughters. The partition and releases have not been made upon this principle. I think it is inexpedient to pass on the validity of the will, we have only heard one side of the question, and the persons interested beyond the life estate are not before the court."

Nelson, Chief Justice, concurred in the views thus expressed, and in the disposition to be made of the cause.

Whereupon the decree of the Chancellor was unanimously reversed, and the following decree entered.

" It is ordered, adjudged, and decreed, that the respondent either took a life estate under the will in five undivided forty-second parts of the real estate of the testator; or, he together with the other sons and daughters took the real estate as heirs at law in equal shares; and in either case, the respondent can not make a good title in fee simple to the lot mentioned in the pleadings in this cause."

The decision of the Court of Errors in the foregoing case, not having settled the question of the validity of the will of Nicholas Wm. Stuyvesant, a new bill for the specific performance of an agreement for the sale of one of the lots belonging to the estate was filed by one of the sons before the Chancellor, upon a contract made after the decision of the Chancellor in the case of *Salmon* v. *Stuyvesant*, but before the decision in the Court of Errors. The case presented substantially the same facts and questions, except that all the children and heirs of the testator had joined in a release of the lot in question to the complainant. This case is reported in the Court of Errors under the title of

Root, appellant, *v.* Stuyvesant, respondent; 18 Wend. 257, 318.   Opinion of the Chancellor given, 18 Wend. 263, 4, 5, 6.

The Chancellor says : "In consequence of the doubts expressed by some of the members of the Court of Errors, when the case of *Salmon* v. *Stuyvesant*, came before them,

since the making of the contract for this lot, the defendant refused to take the title. It is, therefore, I presume, not very material how the question is decided here, as neither party will rest satisfied with my decision. But I have as yet, seen nothing to induce me to believe that the testator intended to leave his children pennyless, for the purpose of giving an estate worth a million of dollars, if it was in a situation to be used for any beneficial purpose at this time, to unborn generations. The circumstances of the case show that it was impossible, if he was in possession of his senses, that he could have understood the provisions of the Revised Statutes as applicable to this will ; and it is therefore impossible to give any effect to the limitations over, without entirely defeating his intention to give a present and beneficial interest to his children." The Chancellor therefore holds, that to carry the residue of the will into effect, after striking out the provisions rendered void by the Revised Statutes, would be to defeat the real intentions of the testator ; and that therefore, under the releases given by the children and heirs, the plaintiff had acquired a good and valid title to the lot sold, and was entitled to a decree for the specific performance of the agreement.

For the reasons of this decision, the Chancellor refers to his opinion in *Salmon* v. *Stuyvesant*, which he gives at large.—(pp. 262, 3, 4, 5.) In that he said : " As the testator survived until after the Revised Statutes went into operation, and republished his will in 1833, it has now become impossible to carry into effect the provisions of the will, except in one particular, without defeating the obvious intentions of the testator, at the time the will was made. The property was of such a nature that it was only valuable for building lots ; and the taxes and assessments to which it would be subject, in a part of the city which was rapidly improving, would be at least equal to the amount for which it could be rented for any other purpose. The testator had also sold a portion of his building lots, and by the terms of sale, the purchasers were required to erect valuable buildings thereon, of a particular description ; and he had covenanted on his part, that whenever buildings should

be erected on his adjacent lots,* they should be of a similar description, such as no mere tenant for life would think of erecting on property held by such a tenure merely."

The Chancellor, after pronouncing the power to lease void by the Revised Statutes, then says: "If the testator could have known the operation of his will, under the provisions of the Revised Statutes relative to powers, was to deprive his children of all beneficial interest in his estate,(?) and to tie it up for the sole benefit of another generation, it is very evident that he would have given the fee to his children, or have devised to them an absolute term of 63 years."

The power in trust to the tenants for life to devise and appoint their shares of the estates to, or in trust for, their children, grand-children, nephews and nieces, he also declares illegal and void. He however holds that part of the will relating to the proportions of the sons and daughters, in the division of the estate, to be valid. (This latter question was not presented in the case of *Root* v. *Stuyvesant*, as the releases of the heirs and children had cured that defect in the plaintiff's title.)

From this decree of the Chancellor in *Root* v. *Stuyvesant*, the defendant appealed to the Court of Errors, where the case was submitted on written arguments.

The Judges of the Supreme Court delivered opinions *seriatim*, for a reversal of the decree of the Chancellor, upon grounds similar, in the main, to those of Mr. Justice Cowen, for reversing the decree in *Salmon* v. *Stuyvesant*. In the following conclusions, they all concurred:

1. That under the operation of the Revised Statutes, the testator's children took the legal estate in their respective shares, of the same quality and duration, and subject to the same conditions as the equitable or beneficial interest intended to be devised to them; the executors retaining the power to execute the will in respect thereto, but no legal estate or other interest in the premises.

---

* ☞ It no where appears, in the report of the case, how many had been sold; still less, whether, if those adjacent lots had been left without being built upon, any or how much damage would have been sustained.

2. That the remainders over and the powers of appointment were both valid; and that the power of appointment was valid, notwithstanding the generality of the terms conferring the right to create successive estates for life in persons not *in esse;* the legal presumption being, that the donee of the power will execute it in conformity to, and not in violation of the rules of law.

3. That notwithstanding the statutory prohibition of powers to tenants for life to lease for more than 21 years, the power to lease in this will was good and valid to make a lease for twenty-one years, and void only for the excess: that an illegal execution would not be presumed; and even that a lease for a longer period would, upon well settled authorities, be void only for the excess.

4. That a power to lease is void only when it is, in the terms of its creation, required to be executed in a mode prohibited by law, and not otherwise.

5. That the failure of the intent of the testator, that his children should have life estates, with the power of leasing for 63 years, is not such a frustration of the general intent of the testator as to justify the declaring the residue of the will void, and permitting the children to take as heirs at law; and, that the testator manifestly intending his children should not take the fee, but life estates only, with a power to lease, the mere reduction in the value of their life estates, by the failure of the power of leasing, is not such an inconsistency with the general intent of the testator as to the quality and duration of their estates, as to authorize a court of justice to confer a fee simple absolute on the tenants for life, in lieu and substitution of their power to lease for a term of years; not even if the life estates by that means were rendered entirely unproductive.

6. That the language of the will being plain and unambiguous, when the true meaning of the testator in the several parts of his will has been ascertained—the rule both at common law and by the revised statutes is, not that the courts shall carry the will into effect if *all* is legal, but *so far* as it is legal: That the court has no more power to declare a legal part void on such grounds, than they have to declare an illegal one valid.

Nelson, Ch. J., at the close of his opinion, (p. 277,) says: " Thus the life estates are an inseparable part of the scheme of this family settlement, and must be maintained to carry it into effect. If I must take the place of the testator, and decide for him whether he would give up the power to lease, or the residue of his will, as both cannot stand, I must say he would have yielded the former; that the disposition of the residue does not necessarily hang upon it; indeed, the power to lease constitutes no part of the testator's estate, as the whole is well devised without it; it would improve the value of the gift to the tenants for life, and may be regretted that it cannot be sustained; but the estate still remains to them. It seems to me to be yielding too much to this diminution of value by the loss of it, to permit it to work so potent an effect as to destroy the estates of the tenants for life; all the estates in the remainder, and all the other powers in the will; to destroy, in other words, a legal and valid disposition of the entire estate of the testator.

Bronson, J. says, upon the same point, (p. 282,) " Every thing is legal and valid except the power to lease, which has failed. Much as I may regret that the immediate descendants of the testator will probably fare worse than his more remote posterity, it is not in my power to apply a remedy."

"We are referred to the cases on the will of Mr. Lorillard and that of Mr. James; but there is nothing in either which can aid the respondent. In each of those cases all the estates and interests which were declared void, sprung out of an illegal trust; they were built upon the trust, and necessarily fell with it. They had no separate existence, but were part and parcel of the trust; that being void, they must fall with it.

" It seems to be supposed that the language which I used in *Hawley* v. *James*, 16 Wend. 144, concerning a will, good in part and bad in part, militates against the validity of this will. Although the remark referred to was a general one, and not on the turning point of that case, I see nothing in it to qualify or recall; nor can I perceive how it favors the overthrow of this will."*

---

* The observation evidently referred to here, is as follows: " Distinct, in-

Cowen, J., in relation to the supposition of the Chancellor, that "if the testator was in possession of his senses, it was impossible that he could have understood the provisions of the Revised Statutes as applicable to this will; and that if he could have known what their operation was, it is very evident that he would have given the fee to his children, or have devised an absolute term for 63 years," asks: (p. 298:) "Upon what authority are we to assume that this testator did not know the law? Has such a principle of construction been before acted upon? By what authority are we to adopt, as a principle of construction, the testator's knowledge of the law in 1828, and his ignorance in 1833? Suppose he had committed a mistake in 1828, was that the day of saving grace and light, and 1833 an hour of darkness which is to destroy a testament, as if its author had been of unsound mind? No. When first made, the will contained a valid power to make leases. After the Revised Statutes, the testator, by republishing his will, or even suffering it to stand, strikes out the power. It is a change which he had a right to make." (p. 298.)

"I remember, that shortly after these statutes took effect, a thief broke into an outhouse and stole an article of small value. In 1828, it would have been but a petty larceny; in 1830, it was a burglary; and although he had not yet a single year's opportunity to learn the legal nature and consequences of such an act, the court sentenced him to the state prison. The argument was much stronger for his ignorance of the change which the law had undergone, in his case, than that now urged. Yet, I ask, what judge would have listened to it?" He adds, on this same subject, at page 306:

"It would have been some consolation, when we were told of the darkness of 1833, and that we are to presume ignorance of the true construction of our new statutes at

---

dependent provisions, which are in themselves free from objection, will not be invalidated by other separate provisions, which are contrary to law. But if the good and the bad are so intermingled that the one cannot be separated from the other, then both must fall together; and where a particular disposition, valid if alone, forms part of, or depends on a general purpose, contrary to law, both will be void, and must share a common fate."

that period, if we could have been told or could we now tell at what era the eclipse shall be considered as removed."

" On the whole, all the provisions in the will, except that for leasing, being as I think valid to their full extent, my conclusion is, that we have no power to disturb them. If we have the power, on the notion of consulting the testator's intent, I feel equally clear, that we should altogether violate that intent, by creating a fee in his children." (p. 313.)

Mr. Senator Dickinson delivered the only opinion in favor of *affirming* the Chancellor's decree. If not encumbered with too much legal lore, it is almost superabundant in rare specimens of judicial rhetoric. For example, he says, p. 314,

"By an examination of this will, it will be seen, that it originated in one of those vain and mistaken efforts of human ambition, to rear and perpetuate a monument of accumulated wealth, upon which a long line of descendants might rise above the storms and floods of poverty and adversity ; and that its progress was arrested by the Revised Statutes, which confounded the language of its builder.

" The revised statutes make the following summary inroad upon this last will and testament, leaving a meagre skeleton of what came from the hand of the testator. *First.* They declare the devise of the real estate to the executors in fee in trust, is void. 1 R. S. of Trusts, § 47 and 49. *Second.* They destroy the right of the testator to perpetuate the property in his family in the manner and to the extent provided by his will. *Thirdly.* They cut off the power of the life tenants to lease for over 21 years, which is sought to be given by the testator. *Fourth.* They substantially destroy the trusts created for the protection of the married daughters of the testator."

[In respect to this last objection, which the Chancellor also faintly suggests, Mr. Justice Cowen well answers it, in his opinion in this case. He says : p. 310. " But the Chancellor thinks it an evil that the trust for the benefit of the daughters should be turned by the revised statutes, into a legal estate, and subjected to the power of the husband. Such may be the consequence ; but surely the evil is not mitigated by giving them a legal estate in fee ; yet that is

done by his decree. Under the statute, they alone could suffer. By giving them a fee, we place the power in their hands to ruin themselves and their children too, by aliening their whole estate on the request of their husbands. The remedy appears to me worse than the disease."

Craving indulgence for detaining the reader from it, we return to Mr. Senator Dickinson's opinion.

The senator's next position is, that the power of leasing is void for 21 years, as well as 63, as it is not one of those powers, "enumerated and defined." (1 R. S. Stat. of Powers.) "Although we can not look at the thing devised for the purpose of giving construction to the will, we can certainly do so for the purpose of ascertaining the intention of the testator. The will sought to give the children bread; but legislation has turned it to a stone. The whole beauty and harmony of this will is (? are) broken down by the strong arm of written law. We are not permitted to re-fashion it, after the plan of its projector, but can only gather up the disjointed fragments, and unite them with *judicial cement!* It will then, neither speak the language of the testator, nor do justice to his children. As a will, it will counteract the law of descent, and give only a naked life estate in name, weighed down by numerous contingencies; and this too, to the children of his body, who, it is evident, he intended should participate liberally in his bounty. This patrimonial tree offered shade and shelter to the children of the testator. Its foliage has been withered, and its branches lopped off, by the omnipotence of legislation, but they are pointed to its naked and sapless trunk, and there invited to seek repose and protection. The whole life and spirit of the will has (have) departed, and the effort to resuscitate it by judicial power, will be as unavailing as an attempt to "back to its mansion call the fleeting breath," of Nicholas William Stuyvesant. We can not warm it into life and being, nor re-invigorate it with the soul breathed into it by the testator; but as an inquest to declare the cause of its death, we should pronounce it to be that of legislative visitation. Is, I ask emphatically, this scarred and mutilated instrument or any separate or independent provision of it, the last will and tes-

tament of Nicholas W. Stuyvesant? Would he have set to
it his hand and seal as such? I can not believe it for a
moment."

Whether owing to the logic or to the rhetoric of Mr. Sen-
ator Dickinson, or to the reasoning and authority of the
Chancellor's opinion, the Court of Errors *affirmed* the Chan-
cellor's decree.

For *reversing* the decree, the president of the senate, Ch.
J. Nelson, Justices Bronson and Cowen, and Senators Law-
yer, Tracy and Wager, 7. For affirmance, 25 Senators.

The principle of this decision seems to be, as stated by the
note of the reporter, "That, as the power to lease was reduced
from 63 to 21 years, (if even valid for that term,) in view of
the peculiar situation of the property devised, the carrying
the residue of the will into effect according to its terms,
*would defeat the principal intent of the testator*, and that
therefore it ought to be declared *void*, except as to the direc-
tion of the proportions in which the children should take
and the power of partition given to the executors; that with
these exceptions the children of the testator took as *heirs at
law;* and the *powers in trust* to appoint the remainders, and
also the remainders over were void."

---

The next case upon the statute of trusts and powers, and
also involving the above question of the validity of a will
where part is valid and other parts void, was that of,